**ZEFF LAW FIRM, LLC**
Gregg L. Zeff, Esquire
Eva C. Zelson, Esquire
Michele A. McKnight, Esquire
100 Century Parkway, Ste 160
Mount Laurel, NJ 08054
(856) 778-9700 (T)
(609) 534-0992 (F)
gzeff@glzefflaw.com
*Attorneys for Plaintiff*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTICT OF PENNSYLVANIA**

| | |
|---|---|
| BRUCE A. HARMON, Individually and as Administrator of the Estate of RONALD I. HARMON, Deceased, and on behalf of all statutory beneficiaries,<br><br>*Plaintiff*,<br><br>v.<br><br>THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA (d/b/a The University of Pennsylvania; and responsible for the University of Pennsylvania Police Department),<br><br>and<br><br>JOHN DOE UPPD POLICE OFFICERS 1–10, individually and in their official capacities,<br><br>and<br><br>OFFICER JAMES SQUADRONI<br><br>And<br><br>OFFICER JAMES SCHWARTZ<br><br>And | CIVIL ACTION No.<br><br>**JURY TRIAL DEMANDED** |

| | |
|---|---|
| JOHN DOE UPPD SUPERVISORS / COMMAND STAFF 1–5, individually and in their official capacities,<br><br>*Defendants*. | |

## CIVIL ACTION COMPLAINT

Plaintiff, Bruce A. Harmon, individually and as Administrator of the Estate of Ronald I. Harmon ("Decedent" or "Harmon"), by and through counsel, files this Complaint and avers as follows:

## INTRODUCTION

1. This action for declaratory, injunctive, monetary, and other appropriate relief is brought to redress the deprivation of Decedent's rights secured by the United States Constitution, including the Fourth Amendment, and by the laws of the Commonwealth of Pennsylvania, arising from a police confrontation on November 5, 2024 at or near 4238 Spruce Street, Philadelphia, Pennsylvania, in which Mr. Harmon was wrongfully shot by police with a taser and collapsed onto cement, suffering a blunt impact head injury that caused his death.

2. Ronald Harmon died on January 9, 2025, from complications of blunt impact injury to the head. The manner of death is listed as homicide.

## JURISDICTION AND VENUE

3. This action is brought pursuant to 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.

4. This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3).

5. This Court has supplemental jurisdiction over state-law claims under 28 U.S.C. § 1367.

6. Venue is proper in this District under 28 U.S.C. § 1391(b) because the events and omissions giving rise to the claims occurred in Philadelphia, Pennsylvania, within this District, and Defendants reside in and/or conduct business in this District.

## PARTIES

7. Plaintiff, Bruce A. Harmon is an adult individual and resident of Pennsylvania and is the brother of Decedent.

8. Plaintiff has been appointed as the Administrator/Personal Representative of Decedent's estate (and bring this action in that representative capacity and on behalf of statutory beneficiaries).

9. Plaintiff's Decedent Ronald I. Harmon ("Ronald Harmon or Harmon") was born January 25, 1972, and died January 9, 2025.

10. Defendant The Trustees of the University of Pennsylvania ("Penn" or "Trustees") is the proper entity to sue for actions of the University of Pennsylvania Police Department ("UPPD") and UPPD personnel.

11. UPPD officers operate with municipal-police-type authority within their patrol zone and are state actors for purposes of 42 U.S.C. § 1983, and the Trustees are the proper municipal-analog defendant for Monell purposes.

12. Defendant Officer James Squadroni ("Officer Squadroni") at all times relevant hereto was employed as a UPPD police officer. He is sued individually and in his official capacity.

13. At all times relevant hereto, Officer Squadroni was acting under the color of state law, and pursuant to the police powers granted to him by UPPD and the Commonwealth of Pennsylvania.

14. Defendant Officer James Schwartz ("Officer Schwartz") at all times relevant hereto was employed as a UPPD police officer. He is sued individually and in his official capacity.

15. At all times relevant hereto, Officer Schwartz was acting under the color of state law, and pursuant to the police powers granted to him by UPPD and the Commonwealth of Pennsylvania.

16. Defendants John Doe UPPD Police Officers 1–10 are UPPD sworn officers who participated in the confrontation, seizure, and/or use of force against Harmon on November 5, 2024. After reasonable inquiry, their identities are presently unknown to Plaintiff and will be substituted if and when learned through discovery.

17. Defendants John Doe UPPD Supervisors / Command Staff 1–5 are supervisors and/or final policymakers for training, supervision, discipline, tactics, and force review and were responsible for policies/customs/practices that caused the constitutional

violations and death described herein. After reasonable inquiry, their identities are presently unknown and will be substituted when learned.

## FACTUAL ALLEGATIONS

18. On November 5, 2024, at approximately 7:20 PM, Harmon sustained fatal injury at or near 4222 Spruce Street, Philadelphia, PA 19104 caused by UPPD Defendant Officer Squadroni wrongfully deploying a taser.

19. The events that lead to Plaintiff's death will be referred to as "the incident."

### UPPD Rules

20. At the time Defendant Officer Squadroni and Defendant Officer Schwartz first observed Ronald Harmon, on November 5, 2024, they knew or should have known that UPPD had a series of written policies and procedures for which all UPPD police officers were required to follow in order to preserve the lives of citizens.

21. Among the UPPD policies and procedures that Defendant Officer Squadroni and Defendant Officer Schwartz knew or should have known about on November 5, 2024, include but are not limited to: UPPD Directive 1, use of force, UPPD Directive 2, authorized weapons/ECD and UPPD Directive 95, foot pursuit. ("Collectively referred to as the "policies.")

22. Upon information and belief, these policies were drafted by law enforcement personnel.

23. Upon information and belief, UPPD police officers received or should have received training on these policies by law enforcement personal.

24. Upon information and belief UPPD police supervisors were responsible for ensuring that UPPD police officers:

a. Were properly trained on the policies

b. Understood the content of the policies

c. Followed the training and policies.

25. Upon information and belief, UPPD police supervisors were responsible for enforcement of the UPPD policies.

26. As of the date of the incident:

a. UPPD police officers were permitted to use reasonable and necessary force when attempting to apprehend a suspect.

b. UPPD police officers were permitted to use electronic control devices (“tasers”) if a person or persons is violent, actively aggressive, threatening, physically resisting arrest, or actively resisting in a manner likely to cause injury to the officers or others.

c. UPPD police officers were not permitted to us a taser against unarmed suspect attempting to elude capture by fleeing who is wanted for a non-violent misdemeanor, summary or traffic offense.

27. At the time of this incident, a reasonably trained officer of the UPPD knew or should have known that:

a. Taser deployment causes neuromuscular incapacitation.

b. Taser deployment causes a person to lose voluntary muscle control.

c. Taser deployment may cause a person to fall without the ability to brace.

d. Taser manufacturers warn that officers must understand that when a taser is used, people will fall down and people will injure themselves.

28. Before deploying a taser, UPPD officers are required to analyze the conditions to assess:

a. What offense is suspected.

b. Is the person armed?

c. Is the person threatening anyone?

d. Is the person moving towards someone or away from the officers?

e. Can the person be identified and apprehended later?

f. What is the terrain?

g. What injury risk would a taser- created fall impose?

29. At the time of this incident, a reasonably trained officer of the UPPD knew or should have known that in conducting a foot pursuit, the UPPD policy requires:

a. consideration of the nature of the offense,

b. whether the suspect is armed,

c. the surrounding environment,

d. the availability of backup,

e. communications on whether later apprehension is possible.

30. At the time of this incident, Defendants Officers Squadroni and Schwartz knew or should have known:

a. That they were exercising state police power.

b. That a taser should not be discharged at a suspect that appears to be non-violent and involved in a property related crime.

c. That flight alone did not justify serious force.

d. That flight alone does not justify the use of a taser.

e. That UPPD policies sharply limited taser use against unarmed fleeting, non-violent suspect, and

f. That firing a taser at a person moving on hard pavement creates a foreseeable risk of uncontrolled fall and head injury.

31. UPPD Directive One ("Use of Force"), amended 5/27/2021, states it is UPPD policy to use "only the amount of force that is reasonable and necessary," and that "unreasonable, unnecessary force" and/or failure to provide proper medical treatment will result in "certain and severe disciplinary action."

32. Directive One further requires officers to intervene and notify supervisory authority if they observe unreasonable force or become aware of policy/law violations, citing CALEA 1.2.10.

33. Directive One requires rendering medical aid and transport for subjects exposed to force, including when a subject is exposed to an ECD, complaints of injury, or when injury is suspected/observed.

34. Directive One includes de-escalation requirements and states supervisors must explain why de-escalation was not appropriate or how it was used; it also provides for Use of Force Board review and an annual analysis and publication of a use-of-force report.

35. UPPD Directive Two (“Authorized Weapons: Training, Proficiency and Usage”), amended 6/23/2021, governs ECD/Taser authorization, training, and use. It requires annual ECD recertification and provides restrictions including:

a. ECD activation threshold limited to persons who are violent, actively aggressive, threatening, physically resisting arrest, or actively resisting in a manner likely to cause injury;

b. Warning and opportunity to comply are generally required;

c. One 5-second cycle standard; additional cycles independently justifiable; more than three cycles prohibited;

d. Avoid intentional targeting of sensitive areas and avoid aiming at the chest to reduce risk of cardiac arrest;

e. The ECD shall not be used against passive resistance; and shall not be used against an unarmed suspect fleeing who is wanted for a non-violent misdemeanor/summary/traffic offense;

f. Post-deployment medical transport is mandatory;

g. Use-of-force board review and internal investigation triggers exist for serious bodily injury, prolonged activation, punitive/abusive use, training deviation, or use on at-risk persons.

36. UPPD Directive Ninety-Five ("Foot Pursuits"), amended 8/01/2023, provides that officer/public safety are the overriding consideration and contains termination triggers, including when danger outweighs apprehension need and/or identity is established allowing later apprehension (as summarized in the materials you collected).

37. These Directives (policies) and their CALEA-cited provisions establish that UPPD recognized:

a. The need for de-escalation and intervention;

b. The need for strict limitations on intermediate weapons such as ECDs;

c. The foreseeability of serious injury from certain tactics and the need for medical aid; and

d. The need for meaningful supervisory review and accountability.

38. Upon information and belief, notwithstanding these written Directives (policies), UPPD—through the Trustees and UPPD leadership—maintained customs, practices,

and/or failures in training/supervision/discipline that predictably resulted in unconstitutional force, inadequate medical response, and fatal outcomes.

Facts about the Incident

39. On November 5, 2024, at approximately 7:20 p.m., Defendant Officer Squadroni and Defendant Officer Schwartz observed Ronald Harmon taking a small package from the foyer of a building in the 42nd block of Spruce Street in Philadelphia.

40. At the time Defendant Officer Squadroni saw Harmon taking a small package, he knew or should have known that Harmon may have committed a non-violent misdemeanor by taking the package.

41. At the time Defendant Officer Schwartz saw Harmon taking a small package, he knew or should have known that Harmon may have committed a non-violent misdemeanor by taking the package.

42. Harmon was chased on foot by UPPD Officer Jason Squadroni.

43. Defendant Officer James Schwartz, after witnessing Harmon taking a small package from the foyer of 4222 Spruce Street, chased Harmon in a UPPD vehicle.

44. Harmon discarded the small package during the pursuit.

45. At no time did Defendant Officer Squadroni observe a weapon on or about the person of Harmon.

46. At no time did Defendant Officer Schwartz observe a weapon on or about the person of Harmon.

47. At no time was any communication made to Defendant Officers Squadroni or Schwartz that Harmon was armed or suspected of being armed.

48. Defendant Officer's Squadroni 's and Schwartz's pursuit of Harmon violated the policies.

49. Upon seeing Defendant Officer Schwartz's police vehicle ahead of him, Harmon turned around and ran past Defendant Officer Squadroni.

50. After Harmon ran past him, Defendant Officer Squadroni removed his taser and deployed it, striking Harmon in the back.

51. Being struck in the back by Defendant Officer Squadroni's taser caused Harmon to lose neuromuscular control.

52. According to Defendant Officer Squadroni's statement, after being struck by the taser "he [Harmon] fell forward and [h]it his head on the curve(sic)."

53. Upon information and belief, the "curve" referred to by Defendant Officer Squadroni means "curb."

54. When Defendant Officer Squadroni deployed his taser at Harmon, Defendant Officer Squadroni violated the policies that require that a taser shall not be used against unarmed suspect who is wanted for a non-violent misdemeanor, summary or traffic offense. And is attempting to elude capture by fleeing.

55. At the time Defendant Officer Squadroni deployed his taser at Harmon, Defendant Officer Squadroni failed to assess and/or failed to properly assess and/or was

improperly trained regarding assessment of the conditions required before using taser level force.

56. Defendant Officer Squadroni had no physical contact with Harmon before he deployed his taser.

57. Defendant Officer Schwartz had no physical contact with Harmon before Officer Squadroni deployed his taser.

58. Harmon did not verbalize any threats to Defendant Officers Squadroni or Schwartz prior to Officer Squadroni deploying his taser.

59. Defendant Officer Squadroni has not written any statement regarding this incident that would indicate that any police officer, including Officers Squadroni and/or Schwartz or any other person was in physical risk of harm, violence or death from Harmon during the incident.

60. Defendant Officer Schwartz has not written any statement regarding this incident that would indicate that any police officer, including Officers Squadroni and/or Schwartz or any other person was in physical risk of harm, violence or death from Harmon during the incident.

61. As a direct result of being unlawfully struck with a taser, Harmon died.

62. The official death record reflects that Mr. Harmon “fell/collapsed during confrontation with police” and suffered a blunt impact injury to the head.

63. Mr. Harmon died on January 9, 2025, and the cause of death is recorded as "Complications of blunt impact injury to the head."

64. The manner of death is recorded as Homicide.

65. At the time of the incident it was foreseeable that firing a taser at Harmon would cause serious injury or death.

66. Upon information and belief, Defendant Officers Squadroni and Schwartz seized Harmon within the meaning of the Fourth Amendment during the confrontation.

67. Defendant Officer Squadroni used unreasonable and excessive force during the seizure, including but not limited to force that caused or precipitated Harmon's uncontrolled fall and head impact.

68. The force used included one or more "intermediate weapon" options, including an Electronic Control Device ("ECD"/Taser), and/or physical force and/or takedown tactics that created a foreseeable risk of uncontrolled collapse and head injury on hard ground.

69. The police confrontation arose from suspicion of a low-level property offense consistent with "porch piracy"/package theft allegations.

70. Defendant Officer Schwartz failed to follow UPPD policies regarding foot pursuit and pursuit of suspects.

71. Defendant Officer Schwartz failed to prevent Officer Squadroni from using excessive force against Harmon.

72. The actions of Defendant Officers violate UPPD policies, Commonwealth law and the U.S. Constitution.

**COUNT I**
**VIOLATION OF 42 U.S.C. § 1983 (EXCESSIVE FORCE)**
**(PLAINTIFF V. DEFENDANT OFFICERS SQUADRONI AND SCHWARTZ AND JOHN DOE UPPD POLICE OFFICERS 1–10)**

73. Plaintiff incorporates by reference paragraphs 1-72 as if set forth fully herein.

74. Defendant Officers, acting under color of state law, seized Harmon.

75. Defendant Officers used excessive and unreasonable force under the Fourth and Fourteenth Amendments, pursuant to 42 U.S.C. § 1983, including force that caused Harmon to fall/collapse and sustain blunt-impact head trauma resulting in his death.

76. As a direct and proximate result, Harmon suffered severe injury, pain and suffering, loss of life's pleasures, economic loss and death for which his Estate seeks compensation.

77. Plaintiff seeks compensatory damages and, as to individual officers, punitive damages, plus fees and costs under 42 U.S.C. § 1988.

**COUNT II**
**BATTERY (PENNSYLVANIA LAW)**
**(PLAINTIFF V. DEFENDANT OFFICERS SQUADRONI AND SCHWARTZ AND JOHN DOE UPPD POLICE OFFICERS 1–10)**

78. Plaintiff incorporates paragraphs 1–77.

79. Defendants committed harmful and/or offensive contact with Harmon without lawful justification, resulting in injury and death.

80. Plaintiff seeks compensatory and punitive damages to the extent permitted by law.

**COUNT III**
**ASSAULT (PENNSYLVANIA LAW)**
**(PLAINTIFF V. DEFENDANT OFFICERS SQUADRONI AND SCHWARTZ AND JOHN DOE UPPD POLICE OFFICERS 1–10)**

81. Plaintiff incorporates paragraphs 1–780.

82. Defendants intentionally placed Mr. Harmon in apprehension of imminent harmful or offensive contact, without lawful justification, causing damages.

83. Plaintiff seeks compensatory and punitive damages to the extent permitted by law.

**COUNT IV**
**VIOLATION OF 42 U.S.C. § 1983 — MONELL (FAILURE TO TRAIN / SUPERVISE / DISCIPLINE**
**(PLAINTIFF V. TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA AND DEFENDANTS JOHN DOE UPPD SUPERVISORS/ COMMAND STAFF 1-5**

84. Plaintiff incorporates paragraphs 1–83.

85. The Trustees are liable under Monell because UPPD is a state-actor police force operating with municipal-police authority, and Penn is the proper municipal-analog entity responsible for UPPD policy, training, supervision, discipline, and force review.

86. The Trustees, through policymakers and supervisors, failed to properly train, supervise, and discipline UPPD officers regarding, among other things:

a. Constitutional limits on force under Graham v. Connor factors;

b. The proper and safe use of intermediate weapons including ECDs (including UPPD Directive Two restrictions and medical transport requirements);

c. De-escalation requirements and the duty to intervene and report excessive force (Directive One; CALEA 1.2.10 as cited in Directive One);

d. Safe tactics to prevent foreseeable head-injury falls, especially with tasers and the obligation to render aid and seek medical treatment after force or injury;

e. Foot pursuit decision-making and termination (Directive 95) where the suspected offense is low-level and later apprehension is feasible.

f. Any other acts or inactions discovered in this litigation.

87. These failures amounted to deliberate indifference to the rights of persons encountered by UPPD officers and were a moving force behind the violations and Harmon's death.

88. Plaintiff seeks compensatory damages and attorneys' fees and costs under 42 U.S.C. § 1988.

**COUNT V**
**VIOLATION OF 42 U.S.C. § 1983 — MONELL (UNCONSTITUTIONALA POLICIES / CUSTOMS / PRACTICES)**
**(PLAINTIFF V. TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA AND DEFENDANTS JOHN DOE UPPD SUPERVISORS/ COMMAND STAFF 1-5**

89. Plaintiff incorporates paragraphs 1–88.

90. The Trustees developed, maintained, ratified, and/or tolerated unconstitutional customs, practices, and/or policies, including but not limited to:

a. Tolerating force in circumstances involving low-level suspected offenses where the threat level did not justify intermediate weapons or violent takedowns;

b. Failing to ensure Directive One and Directive Two were meaningfully implemented, enforced, and audited in practice;

c. Inadequate post-force medical response practices despite Directive One and Directive Two requirements;

d. Inadequate supervision and force review practices (including ineffective Use of Force Board review and accountability);

e. Practices that permitted escalation and preventable injury, contrary to stated de-escalation and safety principles embedded in UPPD Directives and CALEA-linked standards cited therein.

f. Any other acts or inactions discovered through this litigation.

91. These policies/customs were a moving force behind the constitutional violations and the death of Harmon.

92. Plaintiff seeks compensatory damages and attorneys' fees and costs under 42 U.S.C. § 1988.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests judgment in his favor and against Defendants as follows:

A. Compensatory damages in an amount to be determined at trial;

B. Punitive damages against the individual officer defendants to the extent permitted by law;

C. Wrongful death and survival damages as permitted by Pennsylvania law (42 Pa.C.S.A. §§ 8301-2, et. Seq);

D. Reasonable attorneys' fees and costs under 42 U.S.C. § 1988;

E. Pre-judgment and post-judgment interest;

F. Declaratory relief as appropriate;

G. Such other and further relief and damages as this Court deems just and proper.

**JURY TRIAL DEMAND**

Plaintiff hereby demands a trial by jury on all issues so triable.

Respectfully submitted,

**ZEFF LAW FIRM, LLC**

BY: *<u>/s/ Gregg L. Zeff, Esq.</u>*
GREGG L. ZEFF, ESQ.
100 Century Pkwy, Ste 160
Mt. Laurel, NJ 08054
856-778-9700
*Attorneys for the Plaintiff*

DATED: October 16, 2026